**SCENIC HUDSON PRESERVATION CONFERENCE, Town of Cortlandt, Town of Putnam Valley and Town of Yorktown, Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

and

**Consolidated Edison Company of New York, Inc., Intervener.**

**No. 106, Docket 29853.**

United States Court of Appeals Second Circuit.

Argued Oct. 8, 1965.

Decided Dec. 29, 1965.

---

half of the costs, including the master's fees, to him.

Lloyd K. Garrison, New York City, (Simon H. Rifkind, Albert K. Butzel, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, and Dale E. Doty, Washington, D. C., of counsel), for petitioner, Scenic Hudson Preservation Conference.

Samuel L. Slutsky, Putnam Valley, N. Y., for petitioner, Town of Putnam Valley.

John C. Tuttle, Peekskill, N. Y., on the brief, for petitioner, Town of Cortlandt.

John R. Kibbe and Raymond Margles, Yorktown Heights, N. Y., on the brief, for petitioner, Town of Yorktown.

Josephine H. Klein, Washington, D. C. (Richard A. Solomon, Gen. Counsel for Federal Power Commission, Howard E. Wahrenbrock, Sol., Melvin Spaeth, Asst. Gen. Counsel, Washington, D. C., on the brief), for respondent.

Randall J. LeBoeuf, Jr., New York City (LeBoeuf, Lamb & Lieby, New York City, on the brief), for intervener.

Before LUMBARD, Chief Judge and WATERMAN and HAYS, Circuit Judges.

HAYS, Circuit Judge:

In this proceeding the petitioners are the Scenic Hudson Preservation Conference, an unincorporated association consisting of a number of non-profit, conservationist organizations, and the Towns of Cortlandt, Putnam Valley and Yorktown. Petitioners ask us, pursuant to § 313(b) of the Federal Power Act, 16 U. S.C. § 825*l*(b), to set aside three orders of the respondent, the Federal Power Commission: [1]

(a) An order of March 9, 1965 granting a license to the intervener, the Consolidated Edison Company of New York, Inc., to construct a pumped storage hydroelectric project on the west side of the Hudson River at Storm King Mountain in Cornwall, New York;

(b) An order of May 6, 1965 denying petitioners' application for a rehearing of the March 9 order, and for the reopening of the proceeding to permit the introduction of additional evidence;

(c) An order of May 6, 1965 denying joint motions filed by the petitioners to expand the scope of supplemental hearings to include consideration of the practicality and cost of underground transmission lines, and of the feasibility of *any* type of fish protection device.

A pumped storage plant generates electric energy for use during peak load periods,[2] using hydroelectric units driven by water from a headwater pool or reservoir. The contemplated Storm King project would be the largest of its kind in the world. Consolidated Edison has estimated its cost, including transmission facilities, at $162,000,000. The project would consist of three major components, a storage reservoir, a powerhouse, and transmission lines. The storage reservoir,[3] located over a thousand feet above the powerhouse, is to be connected to the powerhouse, located on the river front, by a tunnel 40 feet in diameter. The powerhouse, which is both a pumping and generating station, would be 800 feet long and contain eight pump generators.[4]

Transmission lines would run under the Hudson to the east bank and then underground for 1.6 miles to a switching station which Consolidated Edison would build at Nelsonville in the Town of Philipstown. Thereafter, overhead transmission lines would be placed on towers 100 to 150 feet high and these would require a path up to 125 feet wide [5]

[1] At oral argument petitioners made a motion to enlarge the record by including in it the supplemental hearings conducted before a Trial Examiner of the Federal Power Commission in May 1965. These hearings were limited to consideration of the routes of overhead transmission facilities and the design of fish protection devices. Petitioners allege that the May hearings divulge information which should have been developed and considered by the Commission at the time the license was granted. We are not being asked to review the October 4, 1965 order, setting forth the Commission's determination of the questions presented at the May hearings, but rather to consider evidence compiled at the May hearings as a convenient source of information from which inferences can be drawn about the completeness of the March 9 record. For this limited purpose we have granted petitioners' motion.

[2] Capacity for peak load periods is that part of a system's generating equipment which is operated intermittently for short periods during the hours of highest daily, weekly, or seasonal kilowatt demand.

[3] The project's reservoir would contain a surface area of 240 acres and a usable capacity of 25,000 acre-feet. A part of the space which it would occupy is now occupied by a reservoir providing part of the water supply for the Village of Cornwall. Another area consisting of approximately 70 acres of property within the Black Rock Forest, a private forest reserve of Harvard University, would also be inundated by the proposed reservoir. Consolidated Edison has offered appropriate compensation for the acreage which would be used.

[4] According to plans presented to the Federal Power Commission three pumping generator units would be installed and go into operation in mid-1967 and the remaining five in 1968.

[5] However, the path might be even wider at corners, transportation points, access points, or points of an unusual character.

through Westchester and Putnam Counties for a distance of some 25 miles until they reached Consolidated Edison's main connections with New York City.[6]

During slack periods Consolidated Edison's conventional steam plants in New York City would provide electric power for the pumps at Storm King to force water up the mountain, through the tunnel, and into the upper reservoir. In peak periods water would be released to rush down the mountain and power the generators. Three kilowatts of power generated in New York City would be necessary to obtain two kilowatts from the Cornwall installation. When pumping the powerhouse would draw approximately 1,080,000 cubic feet of water per minute from the Hudson, and when generating would discharge up to 1,620,000 cubic feet of water per minute into the river. The installation would have a capacity of 2,000,000 kilowatts, but would be so constructed as to be capable of enlargement to a total of 3,000,000 kilowatts. The water in the upper reservoir may be regarded as the equivalent of stored electric energy; in effect, Consolidated Edison wishes to create a huge storage battery at Cornwall. See Federal Power Commission, National Power Survey 120–21 (1964).

The Storm King project has aroused grave concern among conservationist groups, adversely affected municipalities and various state and federal legislative units and administrative agencies.[7]

To be licensed by the Commission a prospective project must meet the statutory test of being "best adapted to a comprehensive plan for improving or developing a waterway," Federal Power Act § 10(a), 16 U.S.C. § 803(a). In framing the issue before it, the Federal Power Commission properly noted:

"[W]e must compare the Cornwall project with any alternatives that are available. If on this record Con Edison has available an alternative source for meeting its power needs which is better adapted to the development of the Hudson River for all beneficial uses, including scenic beauty, this application should be denied."

If the Commission is properly to discharge its duty in this regard, the record on which it bases its determination must be complete. The petitioners and the public at large have a right to demand this completeness. It is our view, and we find, that the Commission has failed to compile a record which is sufficient to support its decision. The Commission has ignored certain relevant factors and failed to make a thorough study of possible alternatives to the Storm King project. While the courts have no authority to concern themselves with the policies of the Commission, it is their duty to see to it that the Commission's decisions receive that careful consideration which the statute contemplates. See Michigan Consolidated Gas

---

**6.** As has already been noted we are not now concerned with the order of October 4, 1965 in which the Commission established the exact route of the transmission lines and the width of the right-of-way.

**7.** For bills introduced in Congress for the purpose of preserving the Hudson River and adjacent areas see House Introduction No. H.R. 3012, 3918; Senate Introduction No. S. 1386. Hearings were held on May 10 and 11, 1965 before the House of Representatives Subcommittee on Fisheries and Wildlife Conservation. House of Representatives, 89th Cong., 1st Sess., on Hudson River Spawning Grounds.

The New York Joint Legislative Committee on Natural Resources held hearings on November 19 and 20, 1964. See Preliminary Report on the Joint Legislative Committee on Natural Resources, On the Hudson River Valley and the Consolidated Edison Company Storm King Mountain Project (issued February 16, 1965) (hereinafter cited "Preliminary Report").

The Fish and Wildlife Service of the Department of the Interior and the New York State Conservation Department have expressed concern about the effect of the project on the fish life of the Hudson. See Part IV infra.

Numerous conservationist groups have interested themselves in the project, and many of them filed formal petitions to intervene before the Commission.

Co. v. Federal Power Comm., 108 U.S. App.D.C. 409, 283 F.2d 204, 226, cert. denied, Panhandle Eastern Pipe Line Co. v. Michigan Consol. Gas Co., 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227 (1960). Petitioners' application, pursuant to § 313 *(b), 16 U.S.C. § 825*l*(b), to adduce additional evidence is granted.[8] We set aside the three orders of the Commission to which the petition is addressed and remand the case for further proceedings in accordance with this opinion.

## I.

The Storm King project is to be located in an area of unique beauty and major historical significance. The highlands and gorge of the Hudson offer one of the finest pieces of river scenery in the world. The great German traveler Baedeker called it "finer than the Rhine." Petitioners' contention that the Commission must take these factors into consideration in evaluating the Storm King project is justified by the history of the Federal Power Act.

The Federal Water Power Act of 1920, 41 Stat. 1063 (1920) (now Federal Power Act, 16 U.S.C. § 791a et seq.), was the outgrowth of a widely supported effort on the part of conservationists to secure the enactment of a complete scheme of national regulation which would promote the comprehensive development of the nation's water resources. See Federal Power Comm. v. Union Electric Co., 381 U.S. 90, 98–99, 85 S.Ct. 1253, 14 L. Ed.2d 239 (1965); First Iowa Hydro-Electric Coop. v. Federal Power Comm., 328 U.S. 152, 180, 66 S.Ct. 906, 90 L.Ed. 1143 (1946). See generally Cushman, The Independent Regulatory Commission 275–283 (1941); Pinchot, The Long Struggle for Effective Federal Water Power Legislation, 14 Geo.Wash.L.Rev. 9 (1945).[9] It "was passed for the purpose of developing and preserving to the people the water power resources of the country." United States ex rel. Chapman v. Federal Power Comm., 191 F.2d 796, 800 (4th Cir. 1951), aff'd, 345 U.S. 153, 73 S.Ct. 609, 97 L.Ed. 918 (1953).

Congress gave the Federal Power Commission sweeping authority and a specific planning responsibility. First Iowa Hydro-Electric Coop. v. Federal

---

8. The hearings to which the third order refers have already been held; however, the relief petitioners seek is provided by our determination as to the second order.

9. The Supreme Court has noted that:
 "The movement toward the enactment of the Act in 1920 may be said to have taken its keynote from President Roosevelt's veto of a bill which would have turned over to private interests important power sites on the Rainy River." Federal Power Comm. v. Union Electric Co., 381 U.S. 90, 98–99 n. 11, 85 S.Ct. 1253, 1258 (1965).
 President Roosevelt's veto message read:
 "We are now at the beginning of great development in water power. Its use through electrical transmission is entering more and more largely into every element of the daily life of the people. Already the evils of monopoly are becoming manifest; already the experience of the past shows the necessity of caution in making unrestricted grants of this great power." 42 Cong.Rec. 4698 (1908).
 See also President Roosevelt's veto of the James River bill, H.R. 17767, 60th Cong., 2d Sess. (1909), veto message, 43

Cong.Rec. 978 (1909); President Roosevelt's letter appointing the Inland Waterways Commission, 42 Cong.Rec. 6968 (1908), which read in part:
 "Works designed to control our waterways have thus far usually been undertaken for a single purpose, such as the improvement of navigation, the development of power, the irrigation of arid lands, the protection of lowlands from floods, or to supply water for domestic and manufacturing purposes. While the rights of the people to these and similar uses of water must be respected, the time has come for merging local projects and uses of the inland waters in a comprehensive plan designed for the benefit of the entire country. Such a plan should consider and include all the uses to which streams may be put, and should bring together and coordinate the points of view of all users of waters.
 \* \* \* \* \*
 "[The plans of the Commission should be formulated] in the light of the widest knowledge of the country and the people, and from the most diverse points of view."

**614**

Power Comm., 328 U.S. 152, 180–181, 66 S.Ct. 906, 919 (1946) ("instead of the piecemeal, restrictive, negative approach of the River and Harbor Acts and other federal laws previously enacted"); National Hells Canyon Ass'n v. Federal Power Comm., 99 U.S.App.D.C. 149, 237 F.2d 777 (1956), cert. denied, 353 U.S. 924, 77 S.Ct. 681, 1 L.Ed.2d 720, rehearing denied, 353 U.S. 978, 77 S.Ct. 1054, 1 L.Ed.2d 1139 (1957).

Section 10(a) of the Federal Power Act, 16 U.S.C. § 803(a), reads:

"§ 803. Conditions of license generally.

All licenses issued under sections 792, 793, 795–818, and 820–823 of this title shall be on the following conditions:

\* \* \* \* \* \* \*

(a) That the project adopted, \* \* \* shall be such as in the judgment of the Commission *will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial public uses, including recreational purposes;* and if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval." (Emphasis added.)

"Recreational purposes" are expressly included among the beneficial public uses to which the statute refers. The phrase undoubtedly encompasses the conservation of natural resources, the maintenance of natural beauty, and the preser-

vation of historic sites.[10] See Namekagon Hydro Co. v. Federal Power Comm., 216 F.2d 509, 511–512 (7th Cir. 1954). All of these "beneficial uses," the Supreme Court has observed, "while unregulated, might well be contradictory rather than harmonious." Federal Power Comm. v. Union Electric Co., 381 U.S. 90, 98, 85 S.Ct. 1253, 1258 (1965). In licensing a project, it is the duty of the Federal Power Commission properly to weigh each factor.

In recent years the Commission has placed increasing emphasis on the right of the public to "out-door recreational resources." 1964 F.P.C. Report 69. Regulations issued in 1963, for the first time, required the inclusion of a recreation plan as part of a license application. F.P.C. Order No. 260–A, amending § 4.41 of Regulations under Federal Power Act, issued April 18, 1963, 29 F.P.C. 777, 28 Fed.Reg. 4092. The Commission has recognized generally that members of the public have rights in our recreational, historic and scenic resources under the Federal Power Act. Namekagon Hydro Co., 12 F.P.C. 203, 206 (1954) ("the Commission realizes that in many cases where unique and most special types of recreation are encountered a dollar evaluation is inadequate as the public interest must be considered and it cannot be evaluated adequately only in dollars and cents"). In affirming Namekagon the Seventh Circuit upheld the Commission's denial of a license, to an otherwise economically feasible project, because fishing, canoeing and the scenic attraction of a "beautiful stretch of water" were threatened. Namekagon Hydro Co. v. Federal Power Comm., 216 F.2d 509, 511–512 (7th Cir. 1954).

Commissioner Ross said in his dissent in the present case: "[I]t appears obvious that had this area of the 'Hudson

10. The clear intention of Congress to emphasize "recreational purposes" is indicated by the fact that subsection (a) was amended in 1935 by substituting the present language "plan for improving or developing \* \* \* including recreational purposes" for "scheme of improvement and utilization for the purposes of navi-

gation, of water-power development, and of other beneficial public uses." Senate Rep.No.621, 74th Cong., 1st Sess., page 45 stated that the amendment was intended to add "an express provision that the Commission may include consideration of recreational purposes."

Highlands' been declared a State or National park, that is, had the people in the area already spoken, we probably would have listened and might well have refused to license it."

## II.

Respondent argues that "petitioners do not have standing to obtain review" because they "make no claim of any personal economic injury resulting from the Commission's action."

Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), reads:

"(b) Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States Court of Appeals for any circuit wherein the licensee or public utility to which the order relates is located * * *."

■■ The Commission takes a narrow view of the meaning of "aggrieved party" under the Act. The Supreme Court has observed that the law of standing is a "complicated specialty of federal jurisdiction, the solution of whose problems is in any event more or less determined by the specific circumstances of individual situations * * *." United States ex rel. Chapman v. Federal Power Comm., 345 U.S. 153, 156, 73 S.Ct. 609, 612, 97 L.Ed. 918 (1953). Although a "case" or "controversy" which is otherwise lacking cannot be created by statute, a statute may create new interests or rights and thus give standing to one who would otherwise be barred by the lack of a "case" or "controversy." The "case" or "controversy" requirement of Article III, § 2 of the Constitution does not require that an "aggrieved" or "adversely affected" party have a personal economic interest. See State of Washington Dept. of Game v. Federal Power Comm., 207 F.2d 391 (9th Cir. 1953), cert. denied, 347 U.S. 936, 74 S.Ct. 626, 98 L.Ed. 1087 (1954); Reade v. Ewing, 205 F.2d 630 (2d Cir. 1953); cf. Scripps-Howard Radio, Inc. v. Federal Communi-

cations Comm., 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942); Federal Communications Comm. v. Sanders Bros. Radio Station, 309 U.S. 470, 642, 60 S. Ct. 693, 84 L.Ed. 869 (1940); International Union of Electrical, Radio and Machine Workers v. Underwood Corp., 219 F.2d 100, 103 (2d Cir. 1955); Associated Industries, Inc. v. Ickes, 134 F.2d 694 (2d Cir.), vacated as moot, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943); Jaffe, Standing to Secure Judicial Review: Private Actions, 75 Harv.L.Rev. 255 (1961). Even in cases involving original standing to sue, the Supreme Court has not made economic injury a prerequisite where the plaintiffs have shown a direct personal interest. See, e. g., School District of Abington Township v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952).

In State of Washington Dept. of Game v. Federal Power Comm., 207 F.2d 391, 395 n. 11 (9th Cir. 1953), cert. denied, 347 U.S. 936, 74 S.Ct. 626 (1954), the Washington State Sportsmen's Council, Inc., a non-profit organization of residents, the State of Washington, Department of Game, and the State of Washington, Department of Fisheries, opposed the construction of a dam because it threatened to destroy fish. The Federal Power Commission granted the license; the interveners applied for a rehearing which the Commission denied. Petitioners asked for review under § 313(b) and the court upheld their standing, noting:

"All are 'parties aggrieved' since they claim that the Cowlitz Project will destroy fish in [sic] which they, among others, are interested in protecting."

The Federal Power Act seeks to protect non-economic as well as economic interests.[11] Indeed, the Commission recognized this in framing the issue in this very case:

"The project is to be physically located in a general area of our nation

---

11. See discussion in Part I, supra.

steeped in the history of the American Revolution and of the colonial period. It is also a general area of great scenic beauty. The principal issue which must be decided is whether the project's effect on the scenic, historical and recreational values of the area are such that we should deny the application."

■ In order to insure that the Federal Power Commission will adequately protect the public interest in the aesthetic, conservational, and recreational aspects of power development, those who by their activities and conduct have exhibited a special interest in such areas, must be held to be included in the class of "aggrieved" parties under § 313(b). We hold that the Federal Power Act gives petitioners a legal right to protect their special interests. See State of Washington Dept. of Game v. Federal Power Comm., supra.

At an earlier point in these proceedings the Commission apparently accepted this view. Consolidated Edison strongly objected to the petitioners' standing, but the Commission did not deny their right to file an application for a rehearing under § 313(a) of the Act which also speaks in terms of "aggrieved parties." [12]

■ Moreover, petitioners have sufficient economic interest to establish their standing. The New York-New Jersey Trail Conference, one of the two conservation groups that organized Scenic Hudson, has some seventeen miles of trailways in the area of Storm King Mountain. Portions of these trails would be inundated by the construction of the project's reservoir.

■ The primary transmission lines are an integral part of the Storm King project. See Federal Power Act § 3(11), 16 U.S.C. § 796(11).[13] The towns that are co-petitioners with Scenic Hudson have standing because the transmission lines would cause a decrease in the proprietary value of publicly held land, reduce tax revenues collected from privately held land, and significantly interfere with long-range community planning. See City of Pittsburgh v. Federal Power Comm., 99 U.S.App.D.C. 113, 237 F.2d 741, 748 (1956). Yorktown, for example, fears that the transmission lines would run over municipal land selected for a school site, greatly decreasing its value and interfering with school construction. Putnam Valley faces similar interference with local planning and a substantial decrease in land tax revenues.[14]

---

12. Federal Power Act § 313(a), 16 U.S.C. § 825*l*(a), reads:
"§ 825 *l*. Rehearings; court review of orders
(a) Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order."

13. Federal Power Act § 3(11), 16 U.S.C. § 796(11) reads:
" '[P]roject' means complete unit of improvement or development, consisting of a power house, all water conduits, all dams and appurtenant works and structures (including navigation structures) which are a part of said unit, and all storage, diverting, or forebay reservoirs directly connected therewith, *the primary line or lines transmitting power therefrom to the point*

of junction with the distribution system or with the interconnected primary transmission system, all miscellaneous structures used and useful in connection with said unit or any part thereof, and all water-rights, rights-of-way, ditches, dams, reservoirs, lands, or interest in lands the use and occupancy of which are necessary or appropriate in the maintenance and operation of such unit." (Emphasis added.)

14. Permitting the Commission, for reasons of convenience and practicality, to limit the licensing proceeding and to hold for later determination the route of transmission lines, does not divest the petitioning towns of their standing. If we accepted the Commission's contrary argument we would be required to withdraw from the towns their right to challenge the entire integrated project.
Although the order of October 4, 1965 is not before us for review, we note that the Commission has conceded in its Sup-

We see no justification for the Commission's fear that our determination will encourage "literally thousands" to intervene and seek review in future proceedings. We rejected a similar contention in Associated Industries, Inc. v. Ickes, 134 F.2d 694, 707 (2d Cir.), vacated as moot, 320 U.S. 707, 64 S.Ct. 74 (1943), noting that "no such horrendous possibilities" exist. Our experience with public actions confirms the view that the expense and vexation of legal proceedings is not lightly undertaken.

In any case, the Federal Power Act creates no absolute right of intervention; § 308(a), 16 U.S.C. § 825g(a), reads:

"In any proceeding before it, the Commission, in accordance with such rules and regulations as it may prescribe, may admit as a party any interested State, State commission, municipality, or any representative of interested consumers or security holders, or any competitor of a party to such proceeding, or any other person whose participation in the proceeding may be in the public interest."

Since the right to seek review under § 313(a) and (b) is limited to a "party" to the Commission proceeding, the Commission has ample authority reasonably to limit those eligible to intervene or to seek review. See Alston Coal Co. v. Federal Power Comm., 137 F.2d 740, 742 (10th Cir. 1943). Representation of common interests by an organization such as Scenic Hudson serves to limit the number of those who might otherwise apply for intervention and serves to expedite the administrative process.

### III.

The Federal Power Act § 313(b), 16 U.S.C. § 825l(b), reads in part:

"(b) If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such addi-

tional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper."

The Commission in its opinion recognized that in connection with granting a license to Consolidated Edison it "must compare the Cornwall project with any alternatives that are available." There is no doubt that the Commission is under a statutory duty to give full consideration to alternative plans. See Michigan Consolidated Gas Co. v. Federal Power Comm., 108 U.S.App.D.C. 409, 283 F.2d 204, 224–226, cert. denied, Eastern Pipe Line Co. v. Michigan Consol. Gas Co., 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227 (1960); City of Pittsburgh v. Federal Power Comm., 99 U.S.App.D.C. 113, 237 F.2d 741 (1956).

In *City of Pittsburgh*, three months after the hearings were closed, the petitioners attempted to present to the Commission memoranda supporting an alternative suggestion. The District of Columbia Circuit set aside the Commission's order and remanded the case with directions to reopen the record. It found that the Commission had improperly rejected as "untimely" evidence concerning the proposed alternative. The court stated that:

"The existence of a more desirable alternative is one of the factors which enters into a determination of whether a particular proposal would serve the public convenience and necessity. That the Commission has no authority to command the alternative does not mean that it cannot reject the [original] proposal." City of Pittsburgh v. Federal Power

---

plemental Brief that Putnam Valley is in the same position as before the order and that the transmission route chosen

"might be sufficient to cause aggrievement" to petitioner, Yorktown.

Comm., 99 U.S.App.D.C. 113, 237 F.2d 741, 751 n. 28 (1956).

In the present case, the Commission heard oral argument on November 17, 1964, on the various exceptions to the Examiner's report. On January 7, 1965 the testimony of Mr. Alexander Lurkis, as to the feasibility of an alternative to the project, the use of gas turbines, was offered to the Commission by Hilltop Cooperative of Queens, a taxpayer and consumer group. The petition to intervene and present this new evidence was rejected on January 13, 1965 as not "timely." It was more than two months after the offer of this testimony, on March 9, 1965, that the Commission issued a license to Consolidated Edison. When Mr. Lurkis's testimony was subsequently reoffered by the petitioners on April 8, 1965, it was rejected because it represented "at best" a "disagreement between experts." On the other hand, we have found in the record no meaningful evidence which contradicts the proffered testimony supporting the gas turbine alternative.

Mr. Lurkis is a consulting engineer of thirty-nine years experience. He has served as Chief Engineer of the New York City Bureau of Gas and Electric, in charge of a staff of 400, and as Senior Engineer of the New York City Transit Authority, where he supervised the design and construction of power plants.[15] The New York Joint Legislative Committee on Natural Resources,[16] after holding hearings on the Storm King project on November 19 and 20, 1964, summarized Mr. Lurkis's testimony as follows:

"Mr. Alexander Lurkis * * * presented a detailed proposal for using gas turbines. This, he claimed, would meet the alleged peaking need of Con Ed and result in a saving for its customers of

$132,000,000. The Committee has learned that similar gas turbine installations are now in use or proposed for use by a number of progressive electric utilities throughout the nation. In addition to meeting the alleged peak power needs and saving money for the ratepayer, the gas turbines proposed by Mr. Lurkis would have the following advantages:

1) Permit the company greater flexibility in meeting the power needs of its service area. Admittedly, technological developments in power production are changing and improving this field at such a rapid rate that it may well be entirely revolutionized in 10 to 15 years. There are obvious advantages in the gas turbine installations. Small installations can be added as needed to meet demand. This, in contrast to a single, giant, permanent installation such as Con Ed proposes at Storm King Mountain, which would tie the technology and investment of one company to a method of power production that might be obsolete in a few years.

2) Keep the power production facilities within New York City. This would not only avoid the desecration of the Hudson Gorge and Highlands, but, also, would eliminate the great swathe of destruction down through Putnam and Westchester Counties and their beautiful suburban communities." Preliminary Report at 6.

The Committee report, issued on February 16, 1965, three weeks before the license to Consolidated Edison was granted, concluded:

"[T]he whole situation involved in the Consolidated Edison Storm King

---

15. Mr. Lurkis has made numerous studies of utility adequacy including a survey of "blackouts" in New York during 1959 and 1961, which resulted in revisions of the Consolidated Edison system. He is a member of many professional associations and has published numerous articles

and presented many papers on electrical engineering subjects.

16. A total of 107 witnesses were heard; the large majority objected to the project.

Mountain project, and the protection of the Hudson River and its shores, requires further and extensive study and investigation.

\* \* \* \* \* \* \*

This Committee goes on record as opposing Con Ed's application until there has been adequate study of the points indicated in this report." Preliminary Report at 8.

Mr. Lurkis's analysis was based on an intensive study of the Consolidated Edison system, and of its peaking needs projected year by year over a fifteen year period. He was prepared to make an economic comparison of a gas turbine system (including capital and fuel operating costs) and the Storm King pumped storage plant. Moreover, he was prepared to answer Consolidated Edison's objections to gas turbines by indicating:

(1) that gas turbines could meet Consolidated Edison's reserve needs;

(2) that the blackouts of 1959 and 1961 were caused by breakdowns in distribution, not by a lack of power;

(3) that gas turbines would avoid the hazards of weather damage to high transmission lines involved in the Storm King project;

(4) that since 3 kilowatts of power must be generated by steam plants in New York City in order to get 2 kilowatts of power from the Storm King project, gas turbines would be even more useful than the project in reducing air pollution;

(5) that noise from the turbines would be at acceptable industrial levels.

Other benefits envisioned from gas turbines were higher reliability, increased system flexibility, and possible savings in transmission line investment.[17]

Aside from self-serving general statements by officials of Consolidated Edison, the only testimony in the record bearing on the gas turbine alternative was offered by Ellery R. Fosdick. Fosdick's hastily prepared presentation considered turbines driven by steam and liquid fuel as well as gas; his direct testimony occupied less than ten pages of the record.[18] Fosdick's testimony was too scanty to meet the requirement of a full consideration of alternatives. Indeed, under the circumstances, we must conclude that there was no significant attempt to develop evidence as to the gas turbine alternative; at least, there is no such evidence in the record.

The Commission argues that petitioners made "no attempt to secure additional testimony." Yet the record indicates that more than two months before the license was granted the Commission summarily rejected the offer of Mr. Lurkis's testimony.

 It is not our present function to evaluate this evidence. Our focus is upon the action of the Commission. The fact that Lurkis's testimony was originally offered by a non-petitioner, Hilltop Cooperative, is irrelevant. A party acting as a "private attorney general" can raise issues that are not personal to it. See Associated Industries, Inc. v. Ickes, 134 F.2d 694, 705 (2d Cir.), vacated as moot, 320 U.S. 707, 64 S.Ct. 74, 88 L.

---

17. Citing Federal Power Comm. v. Transcontinental Gas Pipe Line Corp., 365 U. S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961) the Commission asserts that "serious policy questions" would be raised by the use of gas, for the generation of electrical energy. But the serious questions alluded to do not excuse the Commission's failure to develop and hear pertinent evidence on the alternative. As to the use of gas, the Supreme Court held in Transcontinental that "a flexible balancing process, in the course of which all factors are weighed prior to final determination,"

is needed in each case. Id. at 23, 81 S. Ct. at 447.

18. Fosdick conceded that he had no firsthand knowledge of the Consolidated Edison system or its requirements. He had been unable to make a study of the economics of alternative methods of generating peaking power, nor had he made an examination of New York City power needs. His testimony on air pollution, which was favorable to Consolidated Edison, was addressed to a question on the "burning of kerosene" and not of natural gas, a non-pollutant.

Ed. 414 (1943); Jaffe, Standing to Secure Judicial Review: Private Actions, 75 Harv.L.Rev. 255, 283 (1961) ("the right to attack an order resting on a record made by others, or no record at all, could be valuable").

Especially in a case of this type, where public interest and concern is so great, the Commission's refusal to receive the Lurkis testimony, as well as proffered information on fish protection devices and underground transmission facilities,[19] exhibits a disregard of the statute and of judicial mandates instructing the Commission to probe all feasible alternatives. Michigan Consolidated Gas Co. v. Federal Power Comm., 108 U.S. App.D.C. 409, 283 F.2d 204, 224, 226, cert. denied, 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227 (1960); City of Pittsburgh v. Federal Power Comm., 99 U.S. App.D.C. 113, 237 F.2d 741 (1956).

## IV.

The Federal Power Commission argues that having intervened "petitioners cannot impose an affirmative burden on the Commission." But, as we have pointed out, Congress gave the Federal Power Commission a specific planning responsibility. See Federal Power Act § 10(a), 16 U.S.C. § 803(a). The totality of a project's immediate and long-range effects, and not merely the engineering and navigation aspects, are to be considered in a licensing proceeding. As Commissioner Ross said in his dissent:

"I do feel the public is entitled to know on the record that no stone has been left unturned. How much better it would be if the public is clearly advised under oath and cross examination that there truly is no alternative? The thread running through this case has been that the applicant is entitled to a license upon making a prima facie case. My own personal regulatory philosophy compels me to reject this approach. This Commission of its own motion, should always seek to insure that a full and adequate record is presented to it. A regulatory commission can insure continuing confidence in its decisions only when it has used its staff and its own expertise in manner not possible for the uninformed and poorly financed public. With our intimate knowledge of other systems and to a lesser extent of their plans, it should be possible to resolve all doubts as to alternative sources. This may have been done but the record doesn't speak. Let it do so."

In this case, as in many others, the Commission has claimed to be the representative of the public interest. This role does not permit it to act as an umpire blandly calling balls and strikes for adversaries appearing before it; the right of the public must receive active and affirmative protection at the hands of the Commission.

This court cannot and should not attempt to substitute its judgment for that of the Commission. But we must decide whether the Commission has correctly discharged its duties, including the proper fulfillment of its planning function in deciding that the "licensing of the project would be in the overall public interest." The Commission must see to it that the record is complete. The Commission has an affirmative duty to inquire into and consider all relevant facts. See Michigan Consolidated Gas Co. v. Federal Power Comm., 108 U.S.App.D.C. 409, 283 F.2d 204, 224, 226, cert. denied, 364 U.S. 913, 81 S.Ct. 276 (1960); Isbrandtsen Co. v. United States, 96 F.Supp. 883, 892 (S.D. N.Y.1951), aff'd by an equally divided court, A/S J. Ludwig Mowinckels Rederi v. Isbrandtsen Co., 342 U.S. 950, 72 S.Ct. 623, 96 L.Ed. 706 (1952); Friendly, The Federal Administrative Agencies 144 (1962); Landis, The Administrative Process 36–46 (1938); cf. City of Pittsburgh v. Federal Power Comm., 99 U.S.App.D.C. 113, 237 F.2d 741 (1956).

19. See Part IV infra.

In Michigan Consolidated Gas Co. v. Federal Power Comm., supra, 283 F.2d at 224, the Court of Appeals of the District of Columbia, in criticizing the Federal Power Commission for refusing to consider an alternative and for failing to take the initiative in seeking information, observed:

> "Even assuming that under the Commission's rules Panhandle's rejection of the settlement rendered the proposal ineffective *as a settlement,* it could not, and we believe should not, have precluded the Commission from considering the proposal *on its merits.* Indeed, *the proposal appears prima facie to have merit enough to have required the Commission at some stage of the proceeding to consider it on its own initiative as an alternative to total abandonment."* (Emphasis added.)

On rehearing the court added:

> "In viewing the public interest, the Commission's vision is not to be limited to the horizons of the private parties to the proceeding.

> Where, as here, a regulatory agency has ignored factors which are relevant to the public interest, the scope of judicial review is sufficiently broad to order their consideration. These limits are not to be confused with the narrower ones governing review of an agency's conclusions reached upon proper consideration of the relevant factors." Id. at 226.

Judge Frank, in response to a submission similar to the one made here, said:

> "This is a somewhat surprising contention, to be contrasted with the following views of Commissioner Aitchison of the Interstate Commerce Commission concerning the obligations of administrative agencies: '* * * The agency does not do its duty when it merely decides upon a poor or nonrepresentative record. As the sole representative of the public, which is a third party in these proceedings, the agency owes the duty to investigate all the pertinent facts, and to see that they are adduced when the parties have not put them in * * *. The agency must always act upon the record made, and if that is not sufficient, it should see the record is supplemented before it acts. It must always preserve the elements of fair play, but it is not fair play for it to create an injustice, instead of remedying one, by omitting to inform itself and by acting ignorantly when intelligent action is possible * * *.' "

Isbrandtsen Co. v. United States, 96 F. Supp. 883, 892 (S.D.N.Y.1951), affirmed by an equally divided court, A/S J. Ludwig Mowinckels Rederi v. Isbrandtsen Co., 342 U.S. 950, 72 S.Ct. 623 (1952). And Dean Landis said:

> "For [the administrative] process to be successful in a particular field, it is imperative that controversies be decided as 'rightly' as possible, independently of the formal record the parties themselves produce. The ultimate test of the administrative is the policy that it formulates; not the fairness as between the parties of the disposition of a controversy on a record of their own making." Landis, The Administrative Process 39 (1938).

In addition to the Commission's failure to receive or develop evidence concerning the gas turbine alternative, there are other instances where the Commission should have acted affirmatively in order to make a complete record.

The Commission neither investigated the use of interconnected power as a possible alternative to the Storm King project, nor required Consolidated Edison to supply such information. The record sets forth Consolidated Edison's interconnection with a vast network of other utilities, but the Commission dismissed this alternative by noting that "Con Edison is relying fully upon such interconnections in estimating its future available capacity." However, only ten

pages later in its opinion the Commission conceded:

"Of significant importance, in our opinion, is the absence in the record, or the inadequacy, of information in regard to Con Edison's future interconnection plans; its plans, if any, for upgrading existing transmission lines to higher voltages; and of its existing transmission line grid in this general area and its future plans."

Moreover, in its October 4, 1965 order, the Commission in explaining how Consolidated Edison would be able to send "substantial amounts" of Storm King power to upstate New York and New England power companies, each December, said:

"ample spinning reserve would be available during the winter from the interconnected companies in New Jersey and Pennsylvania, including the 'mine-mouth' plants. Thus, even at times of the greatest diversion of Cornwall power, Con Edison would have other power sources immediately available to it for its peak requirements."

If interconnecting power can replace the Storm King project in December, why was it not considered as a permanent alternative?

"Commissioner Ross in his dissent said: "In my opinion, the only true alternative that would likely be as economic as the proposed project would be purchased peaking power. There are two possibly differing sources; one would be purchasing

pumped storage or normal hydro peaking which may be in the process of development in New England; or secondly, purchasing steam peaking power from new large scale thermal stations in Pennsylvania or in Appalachia."

There is no evidence in the record to indicate that either the Commission or Consolidated Edison ever seriously considered this alternative.[20] Nor is there any evidence that a combination of devices, for example, gas turbine and interconnections, were considered. Indeed, the Commission stated in its brief that it is "of doubtful relevance to the present case whether there are practical alternatives to an appropriate use of water power by which Con Ed could meet its anticipated needs for peaking power with generally comparable economy." The failure of the Commission to inform itself of these alternatives cannot be reconciled with its planning responsibility under the Federal Power Act.

In its March 9 opinion the Commission postponed a decision on the transmission route to be chosen until the May 1965 hearings were completed. Inquiry into the cost of putting lines underground was precluded because the May hearings were limited to the question of overhead transmission routes. The petitioners' April 26, 1965 motion to enlarge the scope of the May hearing was denied. The Commission insisted that the question of underground costs had been "extensively considered." We find almost nothing in the record to support this statement.[21]

20. At page 39 of the record Mr. M. L. Waring, senior vice-president of Consolidated Edison, described the interconnection system but failed to answer the question: "Would this not be an economical substitute for the pumped storage project?" In later testimony to a similar question he responded: "Yes, [other sources of power] are available, but not in sufficient quantity."

But there was no evidence introduced as to the amount of power available.

21. The Commission contends that petitioners failed to raise the issue of under-

ground transmission line costs, and the bearing of these costs on the licensing of the project, in their Application for Rehearing. But in listing Commission errors, petitioners said:

"finally it excluded from the consideration of * * * where to put the transmission lines the deeper questions of * * * what the cost would be of putting additional portions of the transmission lines underground."

The Philipstown Citizens Association, in its Application for Rehearing, specifically urged that the "Commission committed error in excluding further considera-

Consolidated Edison estimated the cost of underground transmission at seven to twelve times that of overhead lines.[22] These estimates were questioned by the Commission's own staff, which pointed out that Consolidated Edison's estimates incorrectly assumed that the underground route would be the same as the overhead; in fact, an underground route along the New York Central right-of-way would be clearly less costly than the estimate, since there are no large differences of elevation requiring special pumping facilities and no new cross-country right-of-way would be necessary. Moreover, the staff noted that the estimates were based on Consolidated Edison's experience in New York, where excavation and other costs are higher. The Examiner noted the staff's reservations in his opinion, but since no alternative figures had been presented, he accepted those submitted by Consolidated Edison, as did the Commission.[23]

Consolidated Edison witnesses testified that the Storm King project would result in annual savings of $12,000,000 over a steam plant of equivalent capacity. Given these savings, the Commission should at least have inquired into the capital and annual cost of running segments of the transmission line underground in those areas where the overhead structures would cause the most serious scenic damage. We find no indication that the Commission seriously weighed the aesthetic advantages of underground transmission lines against the economic disadvantages.[24]

At the time of its original hearings, there was sufficient evidence before the Commission concerning the danger to fish to warrant further inquiry. The evidence included a letter from Kenneth Holum, Assistant Secretary of the Department of the Interior, and a statement made for the record by Robert A. Cook, on behalf of the New York State Water Resources Commission in which Mr. Cook said: "[T]he possibility still exists that extensive losses of eggs and/or young of valuable species might occur after installation of the proposed screening devices."

Just after the Commission closed its proceedings in November the hearings held by the New York State Legislative Committee on Natural Resources alerted many fisherman groups to the threat posed by the Storm King project. On December 24 and 30, January 8, and February 3 each of four groups, concerned with fishing, petitioned for the right to intervene and present evidence. They wished to show that the major spawning grounds for the distinct race of Hudson River striped bass was in the immediate vicinity of the Storm King project and not "much farther upstream" as inferred by Dr. Perlmutter, the one expert witness called by Consolidated Edison; to attempt to prove that, contrary to the impression given by Dr. Perlmutter, bass eggs and larvae float in the water, at the

---

tion of underground transmission at the remand hearings which started on May 4, 1965."

As we said earlier, the petitioners may raise issues which are not personal to them.

22. Compare Federal Power Commission, National Power Survey 156 (1964). ("Efforts are frequently made to require utilities to place transmission circuits underground. In some circumstances buried cables are advantageous, but the usual cost is 5 to 10 times that of overhead circuits.")

23. The Commission did state the underground costs would be prohibitive "except for short distances," but no substantiation of this position was offered

nor was a definition of short distance given.

24. Commissioner Ross remarked that "the tactics of [Consolidated Edison] were obviously dictated by the precedential effect of underground transmission." See testimony of senior vice-president Waring. "[T]here are thousands of miles of transmission and distribution lines elsewhere in our territory and in the State of New York, where there is just as much or more reason to put the transmission lines underground as there is here." This approach is unacceptable. Each case must be judged on its own merits. The area involved here is an area of *"unique beauty,"* as Commissioner Ross noted in his dissenting opinion.

mercy of currents; that due to the location of the spawning ground and the Hudson's tidal flow, the eggs and larvae would be directly subject to the influence of the plant and would be threatened with destruction; that "no screening device presently feasible would adequately protect these early stages of fish life" and that their loss would ultimately destroy the economically valuable fisheries. Their evidence also indicated that in the case of shad, the young migrate from their spawning grounds, down past Cornwall, and being smaller than the meshes of the contemplated fish screens, would be subject to the hazards already described.[25] The Commission rejected all these petitions as "untimely," and seemingly placing great reliance on the testimony of Dr. Perlmutter, concluded:

"The project will not adversely affect the fish resources of the Hudson River provided adequate protective facilities are installed."

Although an opportunity was made available at the May hearings for petitioners to submit evidence on protective designs, the question of the adequacy of *any* protective design was inexplicably excluded by the Commission.

Recent events illustrate other deficiencies in the Commission's record. In hearings before the House Subcommittee on Fisheries and Wildlife Studying the Hudson River Spawning Grounds, 89th Cong. 1st Sess., May 10, 11, 1965, Mr. James McBroom, representing the Department of the Interior, stated:

"Practical screening methods are known which could prevent young-of-the-year striped bass and shad from being caught up in the [Storm King] project's pumps, but practical means of protection of eggs and larvae stages have yet to be devised.

Furthermore the location of the proposed plant appears from available evidence to be at or very near the crucial spot as to potential for harm to the overall production of eggs and larvae of the Hudson River striped bass. The cumulative effect of unmitigated loss of eggs and larvae of striped bass by this power project could have a serious effect on the Hudson River striped bass fishery and the dependent fisheries around Long Island and offshore."

Mr. E. L. Cheatum, representing the New York State Conservation Department, gave similar testimony. At the May hearings the testimony of Mr. Walburg and Mr. Wagner, witnesses for the Department of Interior, and Dr. Raney and Mr. Massmann, witnesses for Scenic Hudson, was substantially to the same effect. Indeed, the Commission in its October 4 order acknowledged that the protective device to which it had previously referred favorably (March 9 order) "may not be adequate to provide the protection required" (October 4 order).

On remand, the Commission should take the whole fisheries question into consideration before deciding whether the Storm King project is to be licensed.

The Commission should reexamine all questions on which we have found the record insufficient and all related matters. The Commission's renewed proceedings must include as a basic concern the preservation of natural beauty and of national historic shrines, keeping in mind that, in our affluent society, the cost of a project is only one of several factors to be considered. The record as it comes to us fails markedly to make out a case for the Storm King project on, among other matters, costs, public convenience and necessity, and absence

---

**25.** The Committee concluded:
"The Hudson River is a spawning ground for shad and striped bass. A multi-million dollar fishing industry, both commercial and sport, has been built on this process of nature. * * * The Joint Legislative Committee * * goes on record as being unalterably opposed to the granting of Con Ed's application, until such time as there is definite, impartial and conclusive proof that the project will not have an adverse effect on the fish life and spawning process upon which the fishing industry depends for its livelihood.". Preliminary Report 7.

of reasonable alternatives. Of course, the Commission should make every effort to expedite the new proceedings.

Petitioners' application, pursuant to Federal Power Act § 313(b), 16 U.S.C. § 825*l* (b), to adduce additional evidence concerning alternatives to the Storm King project and the cost and practicality of underground transmission facilities is granted.

The licensing order of March 9 and the two orders of May 6 are set aside, and the case remanded for further proceedings.