**ROAD REVIEW LEAGUE, TOWN OF BEDFORD et al., Plaintiffs,**

**v.**

**Alan S. BOYD, individually and as Secretary of Transportation of the United States and Alexander D. Trowbridge, individually and as Acting Secretary of Commerce of the United States, Defendants.**

**No. 67 Civ. 481.**

United States District Court
S. D. New York.
April 28, 1967.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for plaintiffs, Milton R. Wessel, R. Bradlee Boal, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., New York City, Southern District of New York, for defendants, Arthur S. Olick, Michael D. Hess, New York City, of counsel.

The Atlantic Chapter of the Sierra Club, amicus curiae, by Alfred S. Forsyth, New York City.

## OPINION

McLEAN, District Judge.

This is an action to review and set aside a determination of the Federal Highway Administrator, approved by the Secretary of Commerce, made under the Federal Highways Act (23 U.S.C. § 101 et seq.). The complaint seeks a declaratory judgment determining that "the selection and approval by defendants of the Chestnut Ridge alignment for Interstate Route 87 is arbitrary, capricious and otherwise not in accordance with law." It also asks for a permanent injunction requiring defendants to withdraw any approval heretofore given with respect to the Chestnut Ridge alignment, requiring them to advise the State of New York that such approval has been withdrawn, and restraining defendants from "interfering in any manner which is arbitrary, capricious or not in accordance with law with the selection by appropriate action of the State of New York in accordance with the provisions of Title 23 of the United States Code of

an alignment for that portion of Interstate Highway 87 which will connect Armonk and Katonah."

The plaintiffs are the Town of Bedford, a civic association of Bedford residents, two wild life sanctuaries whose property will be adversely affected by the proposed road, certain individuals whose property will be taken for the road, and the Road Review League, a non-profit association which concerns itself with community problems, primarily those involving the location of highways. The defendants are the Secretary of Transportation and the Acting Secretary of Commerce.[1]

Although the complaint mentions 28 U.S.C. §§ 2201 and 2202 (the declaratory judgment sections), 28 U.S.C. § 1361 (the mandamus section), and 28 U.S.C. § 1331 (the federal question section), it is fair to say that jurisdiction is grounded primarily upon Section 10 of the Administrative Procedure Act (5 U.S.C. § 706).

Plaintiffs moved for a preliminary injunction. The motion came on before me on March 3, 1967. Upon the argument defendants orally moved to dismiss the action on the grounds that (1) defendants have an absolute discretion which is not reviewable by this court; (2) in any case these plaintiffs have no standing to ask this court to review it; (3) the State of New York is an indispensable party and this court cannot proceed in its absence.

After consideration, I denied defendants' motion as far as the first two grounds were concerned, for reasons which will be mentioned hereinafter. As to the third ground, I held that the State of New York was at least a proper party and directed that it be brought in.

Upon the return of an order to show cause for that purpose on March 27, 1967, the State appeared and pleaded sovereign immunity. I sustained that plea and denied the motion to bring the State in as a party by order dated March 31, 1967.

In view of the importance of the question presented by this action, and because of the urgency created by the fact that construction of the road along the route complained of was already in progress, I directed, pursuant to Rule 65(a)(2), that the trial of the action on the merits be advanced and consolidated with the hearing on the motion for a preliminary injunction. I reserved decision until the completion of the trial on the question of whether the State is an indispensable party.

Defendants filed an answer which, in addition to denials, alleged six affirmative defenses, i. e., (1) the complaint fails to state a claim for relief; (2) the State of New York is an indispensable party; (3) plaintiffs do not have standing to sue; (4) this court lacks jurisdiction of the subject matter; (5) plaintiffs are guilty of laches; (6) plaintiffs are guilty of "unclean hands." After formal pre-trial proceedings and the entry of a pre-trial order, the consolidated trial and hearing began on April 5, 1967 and continued until its conclusion on April 11, 1967.

Upon the basis of the evidence adduced at the trial, I find the essential facts to be as follows.

The Federal Highways Act provides for a program of federal grant-in-aid to the states to facilitate "the prompt and early completion of the National System of Interstate and Defense Highways" (23 U.S.C. § 101(b)). The routes of the

1. At the time of the administrative determination which plaintiffs seek to review, the Bureau of Public Roads, which administers the Federal Highways Act, was in the Department of Commerce. The Secretary of Commerce delegated his authority to perform most of the functions vested in him by the Act to the Federal Highway Administrator. 25 Fed.Reg. 4166 (1960). The Department of Transportation Act (49 U.S.C. § 1651 et seq.), which became effective on April 1, 1967 (see 32 Fed.Reg. 5453 (1967)), transferred the Bureau of Public Roads to the new Department of Transportation. See 49 U.S.C. § 1655. The Federal Highway Administrator continues to have the authority that was delegated to him by the Secretary of Commerce. See 32 Fed. Reg. 5607 (1967).

system "to the greatest extent possible, shall be selected by joint action of the State highway departments of each State and the adjoining States, subject to the approval of the Secretary * * *." (§ 103(d)). The statute contemplates that the roads shall be planned, constructed and owned by the State. Approval of the federal authorities is necessary, however, in order to obtain grants of federal funds to finance the projects. These grants are 90 per cent of the cost (§ 120(c)).

Interstate Route 87 is a part of this system. The number 87 is now given to the existing New York Thruway from Newburgh north to Albany, and to the Northway from Albany north to the Canadian line. The existing New York Thruway from Elmsford south to New York City is also part of Route 87. Between Elmsford on the south and Newburgh on the north, however, the proposed Route 87 does not follow the existing New York Thruway, nor does it go directly north in a straight line along the east bank of the Hudson from Elmsford to a point opposite Newburgh. Instead, the proposed Route 87 turns east from Elmsford, runs along the existing Cross Westchester Expressway (Route 287) to a point east of White Plains, thence north to Brewster, where it connects with Interstate Route 84. It then runs west along with Route 84 to Newburgh. Thus, in essence, the route traverses three sides of a square to get from Elmsford to Newburgh. This indirect route was conceived by the Department of Public Works of the State of New York and was embodied in a New York statute (Highway Law, McKinney's Consol. Laws, c. 25, § 340–a) which prescribes the "corridor" that the route is to follow. This corridor necessarily takes the road through Bedford. On December 22, 1960 the Federal Bureau of Public Roads approved this corridor at the request of the New York authorities.

The New York statute did not specify the precise route or "alignment" which the road was to take. That was determined by administrative action, as will be recounted hereinafter. The alignment through Bedford which has been decided upon and of which plaintiffs complain, is called the Chestnut Ridge alignment. The alternative alignment or route which was also considered by state and federal officials is called the westerly route. It lies to the west of Chestnut Ridge, nearer the village of Mt. Kisco.

The two proposed routes diverge at a point near Armonk on the south and come together again at a point near Harris Road in the Town of Bedford on the north. The distance between these two points on the Chestnut Ridge route is 8.8 miles. On the westerly route it is .7 of a mile longer, i. e., 9.5 miles. Roughly halfway between Armonk and Harris Road, the Chestnut Ridge route crosses existing state Route 172 which runs generally east and west.

The choice of a route between these two alternatives has given rise to a controversy which has gone on since early 1961. The principal events in that controversy may be briefly summarized as follows.

On February 1, 1961, the New York Superintendent of Public Works, McMorran, requested approval of the Bureau of Public Roads for presentation at a public hearing to be held in the Town of Bedford, as required by statute (23 U.S. C. § 128) of the proposed Chestnut Ridge route. On February 2, 1961, the Division Engineer of the Bureau, Koch, advised McMorran that the proposed route was "satisfactory for presentation at the public hearing." The hearing was held on February 9, 1961. It was very well attended. Opposition to the Chestnut Ridge route was expressed by many, but there were others who favored it. A stenographic transcript of the hearing, and copies of various memoranda submitted by interested parties, were sent to the Bureau. Bureau engineers examined this material and summarized its contents in memoranda. Bureau engineers also made a physical inspection of the area.

McMorran decided to consider the matter further and to make additional studies. In August he sent to the Bureau detailed studies of the two alternate routes. Koch examined these studies and reported on them to the Bureau's Regional Engineer, Swanson, who in turn transmitted them to the headquarters of the Bureau in Washington.

On December 28, 1961, the State Superintendent requested the Bureau's approval for presentation at a second public hearing of the westerly route. The Bureau approved this request. Eventually, McMorran decided to present both routes at the public hearing.

The second hearing was held on February 27, 1962. It was spectacular. Over 1,000 persons attended. There were demonstrations, placards and even balloons. Oratory was well nigh interminable. The meeting began at 1:30 P.M. on February 27 and lasted until 5:00 A.M. the following morning. Some speakers favored Chestnut Ridge; others opposed it. A stenographic transcript of this hearing and accompanying memoranda were sent to the Bureau and were examined by its engineers.

McMorran was persuaded that his original choice of the Chestnut Ridge route was wrong and that the westerly route was preferable from the point of view of "the social, cultural and economic requirements of Westchester County, and the needs of the Interstate System generally." On May 1, 1962, he wrote to Koch, the Bureau's Division Engineer, expressing that opinion and formally requesting approval of the westerly route.

Koch disagreed with this recommendation. On June 8, 1962, he wrote a memorandum to Swanson in which he stated that:

" * * * the 'Chestnut Ridge' location is superior from a purely engineering standpoint. It is the more direct and is estimated to be some $4 million cheaper than the 'westerly' location."

On the other hand, he stated that:

"The 'westerly' location will more closely conform to the established land use pattern of the area. * * * From a purely *planning* standpoint, there is no question that the 'westerly' route would be adopted."

He expressed the view that the possible adverse effects of the Chestnut Ridge location on the character of the area traversed had been exaggerated.

In July 1962, a group of Bedford citizens opposed to the Chestnut Ridge Route, including some of the present plaintiffs, met with Regional Engineer Swanson and explained their position. This was the first of a long series of meetings between various members of this group and federal highway officials.

On August 8, 1962, Swanson forwarded Koch's June 8 memorandum to the Director of Engineering of the Bureau in Washington with a covering letter in which he stated that he concurred in Koch's recommendation that the Chestnut Ridge location be adopted despite the State of New York's request for the westerly route. He expressed the opinion that the information developed at the public hearing and set forth in numerous presentations by various interested parties did not contain "sufficient justification * * * to warrant the expenditure of an additional approximately $4.3 million to construct the 'westerly' route rather than the 'Chestnut Ridge' route." He also concurred with Koch that "the possible adverse effects of the Chestnut Ridge location appear to have been exaggerated."

Two days later on August 10, without, as far as appears, having received any instructions from Washington in the meantime, Swanson wrote to McMorran declining to approve the State's recommended location. Without mentioning Chestnut Ridge by name, he stated:

"There are alternate locations through this traffic corridor which provide essentially the same traffic service, which are estimated to cost as much as 4.3 million dollars less to construct and are 0.7 of a mile shorter than your recommended location."

This was the Bureau's initial decision, to which it has adhered through the ensuing four and one-half years, although on several occasions it has reconsidered it at the request of those who disagreed with it. This initial decision, as has been pointed out, was made by the Regional Engineer of the Bureau, not by the Federal Highway Administrator. There is apparently nothing unusual in this. Comparatively few choices of route locations provoke enough dissension to require determination by the Administrator himself. In this case the furor was violent enough, not only to require the personal attention of the Administrator, but also that of two successive Secretaries of Commerce.

Shortly after Swanson's decision of August 10, 1962, a group of aggrieved Bedford residents, including some of these plaintiffs, met with the Federal Highway Administrator, Whitton, and presented their arguments to him. At about this time also, various important public officials, including senators and congressmen, began to send communications opposing the Chestnut Ridge location to the Secretary of Commerce and to the Highway Administrator. There were many of these over the years.

On November 28, 1962, McMorran "appealed" Swanson's decision to the Highway Administrator. The appeal took the form of a letter to Whitton in which McMorran stated that he considered the Bureau's decision to be "narrow, arbitrary and grossly unwarranted," and that it "coldly sacrifices the countless intrinsic values of existing and potential conservation areas which will be traversed if the easterly alignment is adopted." Apropos of this appeal, McMorran testified at the trial that he was "stunned" by Swanson's decision. On December 20, 1962, Whitton wrote McMorran stating that he had reconsidered the State's request and after a thorough review of the material, remained of the same opinion that approval of the westerly location should not be granted.

On January 9, 1963, McMorran, although reiterating his contrary opinion, capitulated and requested approval of the Chestnut Ridge alignment. This request was promptly granted by the Bureau of Public Roads on January 15, 1963.

Thereafter various interested citizens, including one of the present plaintiffs, began a proceeding in the New York courts under Article 78 of the Civil Practice Act against the New York Superintendent to review the determination which he had made to seek federal approval of the Chestnut Ridge Route. After dismissing the first complaint as insufficient in law (Brown v. McMorran, 39 Misc.2d 716, 241 N.Y.S.2d 483 (West. Co.1963)), the Special Term sustained the amended complaint as an action for a declaratory judgment and injunctive relief (Brown v. McMorran, 42 Misc.2d 211, 247 N.Y.S.2d 737 (West.Co.1963)). The Appellate Division, however, reversed, and granted summary judgment dismissing the complaint on the ground that the Superintendent had had no alternative, under state law, but to take whatever action might be necessary to secure federal approval and federal funds for the road. Brown v. McMorran, 23 A.D.2d 661, 257 N.Y.S.2d 74 (2d Dept.1965)

While the litigation in the state courts was pending, some of the plaintiffs, as well as various public officials, continued to write to the Secretary of Commerce and to the Highway Administrator urging a change in the decision. Finally, on November 7, 1963, Secretary of the Interior Udall appealed to the Secretary of Commerce to endeavor to find an alternative solution. He offered the services of the Bureau of Outdoor Recreation of the Department of the Interior to assist in a restudy of the alternates. This offer was accepted and, at the direction of the Highway Administrator, further engineering work on the road was held in abeyance pending the completion of the Bureau of Outdoor Recreation's study. In January 1964, representatives of this Bureau, together with engineers from the Bureau of Public Roads, visited Bedford, inspected the alternative routes, looked at the wildlife sanctuaries on

Chestnut Ridge and on the westerly route, and conferred with a number of interested Bedford citizens.

The Bureau of Outdoor Recreation rendered its report in February 1964. It concluded that:

"Considering all known factors as well as those which may be projected into the future through adequate and proper planning processes, it is concluded that of the two routes under consideration the westerly route is by far the least damaging to the existing and future open space needs of the county. It appears that in consideration of the open space needs of the county, the expenditure of an additional $4.3 million is rather clearly justified."

On March 27, 1964, Secretary Udall wrote to Secretary of Commerce Hodges expressing his agreement with the Bureau's report and recommending that the westerly route be approved.

On May 22, 1964, several of the present plaintiffs, together with the Planning Administrator of Westchester County, Schulman, met with Secretary of Commerce Hodges and Administrator Whitton. The Secretary expressed the view that the greater cost of the westerly route was a difficult factor to overcome and suggested that perhaps some of the opponents of Chestnut Ridge would be willing to contribute some $4,500,000 in order to defray this additional cost. Some effort was made to raise this substantial sum but it proved to be unsuccessful. Meanwhile, the letters of protest and conferences with highway officials continued.

Administrator Whitton designated an engineer in the Bureau of Public Roads, Lacy, to review the voluminous material which by that time had accumulated. Lacy did so and rendered an oral report to Whitton in which he recommended that the Bureau adhere to its original decision.

On November 9, 1964, a memorandum was prepared in the Washington office of the Bureau of Public Roads which recounted the history of the controversy, referred to the Department of the Interior report, discussed the conservation aspects of the respective routes, and concluded "Public Roads finds the merits of the case more adequately support the selection of the Chestnut Ridge line as the proper location for this highway."

Whitton accepted these recommendations. On December 5, 1964 he wrote to McMorran stating that:

"The reevaluation confirms the earlier decision that the eastern alternative, also referred to as the Chestnut Ridge line, is the location which best serves the overall public interest."

He thereupon reaffirmed the decision and authorized resumption of work.

This was not the end of the matter. In March 1965, some of the plaintiffs met with Whitton and with Secretary Connor, who by this time was Secretary of Commerce. Senator Javits apparently arranged the meeting but did not attend it. After this meeting, Whitton wrote to Weidlein, president of one of the plaintiffs, on March 18, 1965 explaining at some length the reasons for the reaffirmance of the decision.

In August 1965 a Subcommittee on Public Roads of the Senate Committee on Public Works, of which Senator Metcalf was chairman, held a hearing on the highway program. Administrator Whitton testified. Part of his testimony was devoted to explaining his decision on Chestnut Ridge.

In October 1965 Whitton halted engineering work on the road for the second time pending further reexamination. This came about because the opponents of Chestnut Ridge pointed out that the State Department of Public Works had conceded in a letter dated August 3, 1965 to the Supervisor of Bedford that the State did not as yet "have adequate cost estimates" for the route. The Westmoreland Sanctuary, one of the present plaintiffs, employed an expert, Charles H. Sells, to make a cost study of the two routes. Sells' figures were checked by the State Department of Public Works,

which disagreed with some of his conclusions. On February 17, 1966, McMorran transmitted to Whitton Sells' estimates of the cost of the respective routes, together with those of the State engineers. This data showed that costs had risen substantially since the preliminary estimates in 1962.

The 1962 estimate showed a total cost for Chestnut Ridge of $14,500,000 as against a total cost of $18,800,000 for the westerly route. Of these totals, $11,600,-000 and $14,300,000 were construction costs for the respective routes, and $2,-900,000 and $4,500,000, respectively, were the costs of acquiring rights of way. In February 1966, Sells estimated a cost of construction for Chestnut Ridge of $18,778,000 plus cost of right of way acquisition of $3,991,000, making a total of $22,769,000. For the westerly route, he estimated a construction cost of $22,080,000 and cost of right of way acquisition of $2,483,000, for a total of $24,563,000. The difference in totals thus favored Chestnut Ridge by the difference between $24,563,000 and $22,-769,000, i. e., $1,794,000. The New York Department of Public Works, however, estimated a construction cost for Chestnut Ridge of $18,778,000, plus right of way acquisition cost of $2,410,000, making a total of $21,188,000. For the westerly route, it estimated a construction cost of $23,070,000 plus right of way acquisition cost of $3,770,000, making a total of $26,840,000, or a difference in total in favor of Chestnut Ridge of the difference between $26,840,000 and $21,-188,000, i. e., $5,652,000.

On March 18, 1966, a group of Chestnut Ridge opponents met again with Secretary Connor and with Whitton. Senator Metcalf and Representative Fulton were present. There was a full discussion of their contentions, including those based upon the report of the Bureau of the Department of the Interior. Secretary Connor said that he felt that it was his responsibility to make the final decision.

On April 6, 1966, Whitton wrote to McMorran stating that he had considered the new data and all the other relevant factors, that he had discussed the matter with Secretary Connor and Under-Secretary Boyd and that it was their unanimous decision that the road should be built along Chestnut Ridge. Whitton's reasons for this decision as expressed in this letter will be discussed further hereinafter.

On the same day, April 6, Secretary Connor wrote to Governor Rockefeller stating:

"After the most careful evaluation of all factors, I have decided to concur in Mr. Whitton's recommendation that the East or Chestnut Ridge line be reapproved."

This decision of April 6, 1966 is the final administrative determination which plaintiffs seek to review in this action. Plaintiffs assert, however, that even after April 6, the decision should have been reversed because of events that occurred subsequent to that date, and that the refusal to reverse it even as late as December 1966 was arbitrary and capricious.

These subsequent events involved a still further drastic increase in the cost of the road. This came about not only because of a general increase in construction costs between February and December 1966, and increased expenditures for landscaping, but also because of a decision of the State Department of Public Works made in May 1966 to change the road from four to six lanes in width. On May 20, 1966, the State requested the Bureau of Public Roads to approve this change. The Bureau approved it on June 28.

In November 1966 the State Highway engineers prepared a new estimate of construction costs of the Chestnut Ridge route from Armonk to Harris Road. It came to $27,428,000, as compared with the State's estimate in February 1966 of construction costs of $18,778,000. On November 18, 1966, the Bureau of Public Roads approved the State's plans,

specifications and estimate for the project, authorized the State to advertise for bids and committed the federal government to provide the necessary funds in accordance with the Highways Act.

The bids that subsequently were received by the State in December 1966 conformed closely with the State's estimate. Only one bid was received for the construction of the section of the Chestnut Ridge route from Armonk to Route 172. This was in the amount of $19,238,434.86, as compared with the State's November estimate for this section of $19,610,000. The Bureau refused to authorize the State to accept this bid because there had been only one bidder. Consequently, the State again invited bids on this section. Again it received only one bid, from the same bidder as before. This time the bid was somewhat higher, i. e., $19,488,274.86. This bid has not yet been accepted.

Bids were not requested specifically for the construction of the section of the Chestnut Ridge route north from Route 172 to Harris Road. Instead, bids were invited for the entire section of Interstate 87 from Route 172 all the way north to Route 35 at Katonah. The bids submitted for this section included the cost of constructing an elaborate interchange north of Harris Road near Katonah. This will be very expensive. This item of cost is not relevant to the present dispute, since it would be incurred in any event regardless of which route is selected between Armonk and Harris Road.

The State has accepted a bid for the work from Route 172 to Katonah in the amount of $26,041,726.10. Construction work started on this section on January 30, 1967, proceeding southerly from Katonah. It has already reached a point approximately one mile south of Harris Road.

In November 1966 the State also prepared an estimate of construction costs of the westerly route from Armonk to Harris Road. Its estimate was $31,906,000 as against its estimate of $27,428,000 for Chestnut Ridge, a difference in favor of Chestnut Ridge of $4,478,000. The State engineers furnished these estimates to the Bureau of Public Roads. Engineers in the Bureau's district office studied them and made computations of their own.

Whitton testified that he was not furnished in late 1966 with a new comparison between construction costs of Chestnut Ridge and the westerly route. He testified, however, that he was confident that the differential in cost between the two routes was approximately the same as before, even though overall costs had increased. The State's estimates of November 1966 bear this out. It is also apparent that the lower echelons of the Bureau of Public Roads were aware of the State's comparison, whether Whitton was or not.

Plaintiffs have attacked these estimates and the November 1966 computations of the federal district engineers, but they have produced no substantial evidence to impugn them. I am satisfied that the increase in costs between February and November 1966 did not materially affect the difference in the cost of the two routes. The most that can be said is that, percentagewise, the difference at the end of 1966 was not quite as large as it had been previously. Although the evidence does not permit fixing the precise amount of that difference, I find that it amounted to at least $4,000,000, i. e., that the cost of construction of the Chestnut Ridge route as of December 1966 was still at least $4,000,000 less than the cost of constructing the westerly route would have been.

As to the cost of acquiring rights of way, as distinct from cost of construction, we have no actual figures to compare because no right of way has been acquired along the westerly route. The latest estimates on this subject are those of February 1966. At that time the State engineers estimated that acquisition of right of way would cost some $2,410,000 on

Chestnut Ridge as against $3,770,000 for the westerly route. Plaintiffs' expert, on the other hand, was of the opinion that acquisition of rights of way along Chestnut Ridge would be more expensive. He estimated a cost of $3,991,000 for Chestnut Ridge as against $2,483,000 for the westerly route, a difference of $1,508,000. It is by no means clear that Sells' estimate was accurate, but even assuming that it was, the difference would not, in any case, offset the cheaper construction cost of the Chestnut Ridge route.

I conclude that the change in design of the road from four to six lanes after April 1966 and the increase in construction costs after that date does not affect the question to be decided here, one way or the other. If the Highway Administrator's decision of April 6, 1966 was not arbitrary and capricious at that time, it did not become so because of any change in conditions between April and December 1966. On the other hand, if that decision was arbitrary and capricious when it was made, it was not saved by subsequent events. The question, therefore, is whether the decision of April 6, 1966 was arbitrary and capricious at that time.

Before discussing the evidence bearing on that question, I will first note briefly my reasons for denying defendants' motion to dismiss the action on the grounds of the unreviewability of the administrative decision and of plaintiffs' lack of standing to review it. That motion raises difficult questions of federal judicial power, neither of which is free from doubt. On each I have given the benefit of the doubt to plaintiffs.

As to the first question, the Court of Appeals has recently held in Cappadora v. Celebrezze, 356 F.2d 1 (2d Cir. 1966), that the court has power to review a decision of the Secretary of Health, Education and Welfare which refused to reopen a decision disallowing a claim for insurance benefits under the Social Security Act. The court reached this result despite the fact that the Social Security

Act did not provide for judicial review of this particular kind of decision. The court based its conclusion upon the Administrative Procedure Act (5 U.S.C. § 706) which it regarded as a jurisdictional statute. The court said:

"Absent any evidence to the contrary, Congress may rather be presumed to have intended that the courts should fulfill their traditional role of defining and maintaining the proper bounds of administrative discretion and safeguarding the rights of the individual." 356 F.2d at 6.

See also Toilet Goods Ass'n v. Gardner, 360 F.2d 677 (2d Cir. 1966), cert. granted, 385 U.S. 813, 87 S.Ct. 81, 17 L.Ed.2d 53 (1966); United States v. State of New York, 160 F.2d 479 (2d Cir. 1947) (dissenting opinion of L. Hand, J.), cert. denied, 331 U.S. 832, 67 S.Ct. 1512, 91 L.Ed. 1846 (1947); Brown v. McMorran, supra, in which the concurring opinion noted the trend of recent scholarly comment in favor of judicial review of so-called "legislative" administrative acts. 13 A.D.2d 661 at 662, 257 N.Y.S.2d 74 at 76; Jaffe, Judicial Control of Administrative Action 375 (1965).

Cases cited by defendants in which administrative action was held to be unreviewable dealt with other areas of administrative law. None of them involved a decision of the Highway Administrator. The only Highways Act case that can be found, Commonwealth of Massachusetts v. Connor, 248 F.Supp. 656 (D.Mass.1966), aff'd per curiam, 366 F.2d 778 (1st Cir. 1966), was concerned with quite a different point.

I see nothing in the Highways Act which indicates a congressional intent to immunize the Bureau of Public Roads from judicial scrutiny of its acts. Moreover, the new Department of Transportation Act specifically makes the Administrative Procedure Act applicable to proceedings under the Act. 49 U.S.C. § 1655(h). The legislative history indicates that the Transportation Act is declaratory of existing law. House Rep. No. 1701, 89th Cong. 2d Sess. (1966) in 3 U.S.Code Cong. & Ad.News p. 3374.

To hold that these decisions cannot be reviewed, no matter how arbitrary they may be, would be unsound and unjust.

As to the second question, plaintiffs' standing to ask the court to undertake such a review, I have based my decision upon the implications, rather than the exact holding, of the recent decision of the Court of Appeals in Scenic Hudson Preservation Conference v. Federal Power Commission, 354 F.2d 608 (2d Cir. 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966). Under the law as it stood prior to that decision, it may well be that these plaintiffs do not have the necessary standing. See Green Street Assn. v. Daley, 373 F.2d 1 (7th Cir. 1967); Berry v. Housing and Home Finance Agency, 340 F.2d 939 (2d Cir. 1965); Harrison-Halsted Community Group v. Housing and Home Finance Agency, 310 F.2d 99 (7th Cir. 1962), cert. denied, 373 U.S. 914, 83 S.Ct. 1297, 10 L.Ed.2d 414 (1963); Gart v. Cole, 263 F.2d 244 (2d Cir. 1959), cert. denied, 359 U.S. 978, 79 S.Ct. 898, 3 L.Ed.2d 929 (1959). *Scenic Hudson* may have changed that law in cases like the present one.

In *Scenic Hudson*, the court held that an organization devoted to conservation, as well as certain New York towns, had standing to obtain a review of a decision of the Federal Power Commission which granted a license to Consolidated Edison Company to build a hydroelectric project at Storm King Mountain. The court interpreted Section 313(b) of the Federal Power Act (16 U.S.C. § 825*l*(b)) which provides that "[a]ny party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order * * *." The court held that the appellants, who had been parties to a proceeding before the Commission, were "aggrieved" within the meaning of that section. The court discovered such a congressional intent in a provision of the Act (16 U.S.C. § 803(a)) which requires the Commission to adopt a plan which will take into account the use of the area for "recreational purposes."

The court said that this phrase encompasses "the conservation of natural resources, the maintenance of natural beauty, and the preservation of historic sites." (354 F.2d at 614). The court went on to hold:

"In order to insure that the Federal Power Commission will adequately protect the public interest in the aesthetic, conservational, and recreational aspects of power development, those who by their activities and conduct have exhibited a special interest in such areas, must be held to be included in the class of 'aggrieved' parties under § 313(b). We hold that the Federal Power Act gives petitioners a legal right to protect their special interests." 354 F.2d at 616.

The Administrative Procedure Act (5 U.S.C. § 702) entitles a person who is "aggrieved by agency action within the meaning of a relevant statute," to obtain judicial review of that action. The "relevant statute" in this instance is the Federal Highways Act. That Act expresses the intent that "local needs, to the extent practicable, suitable, and feasible, shall be given equal consideration with the needs of interstate commerce." (23 U.S.C. § 101(b)). A project, among other things, is "to conform to the particular needs of each locality." (23 U.S.C. § 109(a)). See also 23 U.S.C. § 134. The Act declares it to be the national policy that "in carrying out the provisions of this title, the Secretary shall use maximum effort to preserve Federal, State, and local government parklands and historic sites and the beauty and historic value of such lands and sites." (23 U.S.C. § 138). Regulations adopted by the Secretary under the Act provide that:

"The conservation and development of natural resources, the advancement of economic and social values, and the promotion of desirable land utilization, as well as the existing and potential highway traffic and other pertinent criteria are to be considered when selecting highways to be added to a

Federal-aid system * * *." 23 C.F.R. § 1.6(c) [2]

 I have concluded that these provisions are sufficient, under the principle of *Scenic Hudson,* to manifest a congressional intent that towns, local civic organizations, and conservation groups are to be considered "aggrieved" by agency action which allegedly has disregarded their interests. I see no reason why the word "aggrieved" should have a different meaning in the Administrative Procedure Act from the meaning given to it under the Federal Power Act. See 3 Davis, Administrative Law § 22.05 at 225 (1958). The "relevant statute," i. e., the Federal Highways Act, contains language which seems even stronger than that of the Federal Power Act, as far as local and conservation interests are concerned. I appreciate that, speaking strictly, *Scenic Hudson* can be distinguished from the present case on the ground that *Scenic Hudson* involved an appeal from an administrative decision in a proceeding to which appellants were already parties, whereas here, plaintiffs have brought an independent action. Plaintiffs were not previously parties in a formal sense to any administrative proceeding, although as a practical matter they participated actively in attempting to secure an administrative determination favorable to their interest. My decision here can be thought to involve an extension of the *Scenic Hudson* doctrine. If so, it is an extension which I believe to be warranted by the rationale of that decision.

 I turn now to the merits of the action. At the outset, I repeat a finding that I made orally at the conclusion of the trial, i. e., that plaintiffs have not proved their contention that the administrative determination which they attack was made in bad faith as a result of "political pressure." I find that the Secretary of Commerce, the Highway Administrator, and the subordinate officials of the Bureau of Public Roads acted honestly throughout, and that their decision was based upon what they in good faith believed to be the merits of the question which they were called upon to decide.

 I also find that defendants have not proved their affirmative defense that plaintiffs are guilty of "unclean hands." It is true that plaintiffs enlisted the aid of various political figures to plead their cause with the Administrator. But there is no evidence that they acted improperly in so doing, or that these various supporters did anything more than give the Administrator the benefit of their views. It is obvious that both the advocates and the opponents of the Chestnut Ridge alignment have done their best to influence the federal highway officials to decide in their favor, but there is no basis in this record for a finding that any of them did anything "unclean." These charges and counter charges of "political pressure" are without foundation. They serve only to cloud the true issue.

Another contention may be disposed of at the beginning. It is apparent from Whitton's testimony, and from some of his letters, that he feels differently about highways than the citizens of Bedford do. In his decision of April 6, 1966, he expressed the opinion that highways "enhance the area through which they pass," and that "those who want to preserve, enhance, and increase our natural and recreation resources will take pride in this facility." I have no doubt that he is sincere in this belief. I can well appreciate, however, that people whose property and interests are affected by these great six-lane roads not only dissent from these opinions, but consider them so bizarre as to be almost irrational. But this attitude on the part of

---

**2.** The new Department of Transportation Act contains an additional provision on this subject, 49 U.S.C. § 1651(b) (2), which states:

"It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites."

See also 49 U.S.C. § 1653(f).

highway officials toward highways in general does not necessarily make their selection of a particular route arbitrary or capricious. Granted that highway engineers may have a point of view which differs from that of conservation groups, they are still capable of observing and noting the conservation aspects of two alternative routes.

I come now to the central question in the case. The evidence makes it clear that if the choice between Chestnut Ridge and the westerly route is viewed strictly as an engineering problem, Chestnut Ridge is the correct choice. It is shorter, straighter and cheaper. This has been true from the beginning. This is doubtless why the State originally selected it before the protests began. It is true now, despite the change in design of the road and the increase in costs over the years.

It is also apparent from the evidence, without serious dispute, that fewer individual property owners will be affected by the Chestnut Ridge route.

But it is equally clear, under the Highways Act, that the choice is not to be made purely and simply on the basis of engineering considerations or by counting the number of landowners who are affected. Other factors must be taken into account, notably local planning needs and the impact of the road upon natural resources and natural beauty. Whitton considered these factors. But plaintiffs contend that the evidence concerning them weighed so overwhelmingly against Chestnut Ridge that it necessarily follows that Whitton did not give these factors their proper weight and that hence his overall decision was so unsound as to be arbitrary. Cf. Wong Wing Hang v. Immigration and Naturalization Service, 360 F.2d 715 (2d Cir. 1966); N. L. R. B. v. Jas. H. Matthews & Co., Industrial Mark. Prod. Div., 342 F.2d 129 (3rd Cir. 1965), cert. denied, 382 U.S. 832, 86 S.Ct. 74, 15 L.Ed.2d 76 (1965).

The evidence establishes the administrative record, i. e., the information which the Administrator had before him. It is on that record that the Administrator acted and on that record that his action must be judged. There was, of course, no record in the usual sense. There was no stenographic transcript of any formal hearing before the Administrator or before a hearing examiner. The stenographic transcripts of the two public hearings held in Bedford in 1961 and 1962 are, however, a part of the record in the sense that they contain data which the Bureau of Public Roads considered. So are the many memoranda and letters submitted to the Bureau by advocates of one route or the other. The report of the Department of the Interior is part of that record. In addition to this written material, which is very voluminous, I admitted testimony of oral communications to the Secretary of Commerce, the Administrator and the Bureau engineers, on the theory that these also are properly part of the record. The parties do not seriously dispute what the administrative record is. They disagree as to its effect.

As to the conservation aspects, there are wildlife sanctuaries on both routes. A marshland sanctuary on the westerly route, consisting of some 46 acres, would be destroyed if that route were adopted. A nearby public park would be adversely affected. On the Chestnut Ridge route, the road would run directly between the Butler Sanctuary and the Westmoreland Sanctuary. These are much larger areas than the western marsh, 254 acres and 105 acres respectively, but only 9.3 acres of one would actually be appropriated for the road, and no land would be taken from the other. Doubtless traffic noises and gasoline fumes would penetrate to some extent into the areas not physically taken. Plaintiffs claim that were it not for the road, adjacent landowners would donate more land to the sanctuaries. There is no definite proof of this. No prospective donor so testified.

Byram Lake, the Mt. Kisco water supply, lies on the Chestnut Ridge route. Special installations are planned to prevent pollution of the lake by drainage from the road. Despite plaintiffs' expressed fears, there is no evidence to show that these precautions will be ineffective.

Throughout the trial both parties tended to emphasize the sanctuaries as of primary importance on the conservation and natural beauty issue. But there are other considerations. The entire countryside has great charm. When one considers the entire stretch of the alternative routes, i. e., 8.8 or 9.5 miles respectively, the evidence does not demonstrate that one is outstandingly superior to the other in overall natural beauty.

The Department of the Interior considered Chestnut Ridge more important from a conservation point of view and believed that more grievous injury to the interests of conservation would result from placing the road there. The New York Commissioner of Conservation expressed a similar opinion. The Bureau of Public Roads did not consider these opinions conclusive. Lacy testified that he was "disappointed" in the Department of the Interior report because "it offered very little in the way of new information." He advised Whitton that it was "a stalemate in so far as conservation and recreational activities were concerned." The District Engineer and the Regional Engineer each believed, with perhaps some justification, that the opponents of the Chestnut Ridge route had exaggerated the injury to wildlife in that area.

After examining all the evidence on the conservation question, I cannot say that the Administrator's evaluation of that evidence was contrary to its overwhelming weight, despite the fact that if I had been in his place I might have evaluated it differently.

Plaintiffs' argument on the local needs and planning aspects is somewhat stronger. The testimony of the Westchester County Planning Administrator as to the advantages of the westerly route from a planning point of view was impressive. At the public hearings the State Department of Commerce and the Westchester County Public Works Department also favored the westerly route for planning reasons. The town of Bedford has consistently favored the westerly route and opposed the Chestnut Ridge route because it bisects the town. Although opinion in the village of Mt. Kisco appears to have been divided, the majority seems to have favored the westerly route. On the other hand, the towns of North Castle and New Castle, which are affected by the road to a lesser extent than Bedford, have favored Chestnut Ridge for planning reasons. The Upper Westchester Community Association has favored Chestnut Ridge. At the public hearings, opinion of local residents was divided.

I believe that the planning evidence preponderates in favor of the westerly route. District Engineer Koch recognized this from the beginning. Whitton seems to have considered the evidence on this subject to be more evenly divided.

Planning is an important factor, but it is only one factor out of several, just as cost is only one factor. The same is true of conservation. The ultimate question is whether the overall decision, viewed in the light of all the competing factors, was arbitrary. Here certain factors are clearly in favor of Chestnut Ridge. Others seem to me to weigh more heavily in favor of the westerly route than Whitton thought they did.

The law is clear that the court cannot substitute its own judgment for that of the administrative agency. N. L. R. B. v. Jas. H. Matthews & Co., supra; Zucker v. Baer, 247 F.Supp. 790 (S.D. N.Y.1965). The decision must be allowed to stand unless it was plainly wrong. I have reviewed this entire lengthy record and I have given this matter considerable thought. Having done so, I conclude that this administrative decision was not wrong enough to permit this court to upset it.

The position of the State of New York must also be considered. Clearly, the State was entitled to an opportunity to be heard as a party in this action. Heyward v. Public Housing Administration, 94 U.S.App.D.C. 5, 214 F.2d 222 (1954); Stevens v. Bartholomew, 222 F.2d 804, 96 U.S.App.D.C. 11 (1955).

Accordingly, I directed that it be brought in. The State was unwilling to come in. It chose to rest on its sover-

eign immunity, as it had the right to do. Chandler v. Dix, 194 U.S. 590, 24 S.Ct. 766, 48 L.Ed. 1129 (1904); Hans v. State of Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

By participating in the federal highway program and seeking federal funds to finance this road, the State did not waive its immunity from suit. DeLong Corp. v. Oregon State Highway Com'n, 233 F.Supp. 7 (D.Ore.1964), aff'd, 343 F.2d 911 (9th Cir. 1965), cert. denied, 382 U.S. 877, 86 S.Ct. 161, 15 L.Ed.2d 119 (1965).

Consequently, the attempt to bring it in as a party had to be abandoned.

Is the State an indispensable party so that this court cannot proceed in its absence? This question was left open in Heyward v. Public Housing Administration, supra, and Stevens v. Bartholomew, supra. One case, involving somewhat analogous facts, has held that an absent governmental party is indispensable. Balter v. Ickes, 89 F.2d 856 (1937), 67 App.D.C. 112, cert. denied, 301 U.S. 709, 57 S.Ct. 941, 81 L.Ed. 1363 (1937).

This case was decided before the recent amendment of Rule 19. No cases in point arising since that amendment have been found.

■■■ In accordance with Rule 19(b), I have considered "whether in equity and good conscience the action should proceed." In view of the fact that the State's absence is of its own choosing, it seems to me inequitable to hold that the State can thereby prevent these plaintiffs from obtaining in a federal court the judicial review of the acts of federal officials to which they are otherwise entitled. I have concluded, therefore, that the State is not an indispensable party.

It does not follow, however, that a court of equity may close its eyes to the position in which the State now finds itself. The State has obtained a commitment from the federal government for many millions of dollars for the construction of this road. In reliance on this commitment, it has entered into a construction contract for over $26,000,000. The contractor has already spent or committed almost $9,000,000 under that contract for labor, materials and equipment.

The State has spent over $1,000,000 in engineering the Chestnut Ridge route. It has acquired 92 rights of way along that route. It has made offers to property owners totalling over $2,000,000, and has already reached agreement with property owners for rights of way on claims aggregating over $200,000.

To enjoin defendants at this stage from carrying out the commitment of the federal government to provide 90 per cent of the necessary funds for this project would create a chaotic situation. Plaintiffs argue that the damage to the State could be mitigated, that the rights of way which the State has acquired could be sold or returned to their former owners, that the course of the road could be changed without undue hardship. These arguments do not seem to me to be realistic. Some loss, as for example, engineering expenses, would obviously be irretrievable. In all likelihood, the ultimate loss would amount to much more. Substantial delay, perhaps amounting to over two years, would be encountered before a new route could be surveyed and engineered.

The Highway Administrator's decision was made on April 6, 1966. Plaintiffs could have sued then. Subsequent events have not materially affected that decision. This action was not begun until February 3, 1967. In the meantime, both federal and state authorities have changed their position in reliance upon that decision. This comes perilously close to laches. At the very least, it is a factor which this court must take into account. The court would not be justified in disregarding it without a stronger showing of illegality of the Administrator's decision than has been made here.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

Plaintiffs' motion for a preliminary injunction is denied. The Clerk is directed to enter judgment in favor of defendants dismissing the action.

So ordered.